UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| LAURA DODD-WHITE and HENRY WHITE, | : | |
| Plaintiffs, | : | 02 Civ. 5749   (PAC) |
| - against - | : | <u>OPINION & ORDER</u> |
| LENOX HILL HOSPITAL, | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff Laura Dodd-White ("Plaintiff" or "Ms. Dodd-White"), an African-American female, brings this action against Defendant Lenox Hill Hospital ("Lenox Hill") for damages resulting from a transfusion of blood tainted with the Hepatitis B virus ("HBV") on September 13, 2000. She alleges medical malpractice and tort claims under New York State law and common law and grafts onto these allegations a civil rights claim pursuant to 42 U.S.C. § 1981. Lenox Hill now moves for summary judgment, arguing that Plaintiff fails to offer sufficient evidence to create a disputed issue of material fact on any of her claims. The Court grants the motion as to the alleged civil rights violations and declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.

BACKGROUND

On September 12, 2000, Ms. Dodd-White was referred to the emergency room of Lenox Hill by Dr. David Valentine, her treating physician, because Ms. Dodd-White suffered from "severe" anemia. (Def.'s Local Rule 56.1 Statement ¶¶ 1-2; Zucker Aff., Ex. A (Ms. Dodd-White's medical records from Dr. Valentine).) Given the severity of her anemia and accompanying

symptoms, including chest pain and shortness of breath, Dr. Valentine wanted Ms. Dodd-White to receive a blood transfusion.[1] (Zucker Aff., Ex. A.)

Ms. Dodd-White arrived at the Lenox Hill emergency room at approximately 2:00 p.m. on September 12, 2002. (Def.'s Local Rule 56.1 Statement ¶ 3.) After intake, Ms. Dodd-White was triaged as needing "urgent" care.[2] (Id.) She was then seen and evaluated by an emergency room physician and transferred to an inpatient unit. (Zucker Aff. ¶ 4.) Ms. Dodd-White claims that she was transferred to a segregated, all-minority floor of the hospital. (Am. Compl. ¶ 22.) According to Ms. Dodd-White, the person occupying the other bed in her room was an African-American woman, all the other patients on her section of the floor were African American, and only minority staff provided the hands-on care of patients on the floor, including nursing, transportation, and food service. (Id. ¶¶ 22-24.)

Ms. Dodd-White waited approximately twelve hours before receiving her transfusion. (Id. ¶ 21.) While she waited, no one explained the risks of a blood transfusion or the alternatives available. (Id. ¶¶ 26-27; Mitchell Aff., Ex. E, at 39-41) Beginning at approximately 2:00 a.m. on September 13, 2000, Ms. Dodd-White received three units of Packed Red Blood Cells. (Am. Compl.

---

[1] Ms. Dodd-White was also scheduled for elective surgery to remove uterine fibroids. (Am. Compl. ¶¶ 17-18.) The doctor could not do the elective fibroid removal surgery until Ms. Dodd-White's anemia was treated and under control. (Id.) Ms. Dodd-White claims that Dr. Valentine recommended the transfusion in preparation for the fibroid removal surgery, not because of the severity of her anemia and physical symptoms, therefore making her eligible for a directed transfusion because her transfusion was in preparation for pre-planned elective surgery. (Id. ¶¶ 18-19, 37.) Ms. Dodd-White's medical records tell a different story. (Zucker Aff., Ex. A.) In the record dated September 12, 2000, Dr. Valentine wrote: "Blood count lower than previous value . . . [G]iven the severity and patient symptoms[,] will admit to Lenox Hill for blood transfusion." (Id.) Dr. Valentine makes no mention of Ms. Dodd-White's uterine fibroid surgery. (Id.)

[2] The three possible categories are "non-urgent," "emergent," or "urgent." (Zucker Aff. ¶ 4.)

¶ 21; Def.'s Local Rule 56.1 Statement ¶ 4.) Ms. Dodd-White was not offered a directed transfusion,[3] but instead received blood from the "community pool." (Def.'s Local Rule 56.1 Statement ¶ 5.)

Processing a directed donation takes at least five business days, because the patient must find a suitable willing donor with a matching blood type and must have the donor's blood screened and tested outside the hospital before it is available for transfusion. (Zucker Aff. ¶ 5 & Ex. G, at 1 (Dep. of Dr. Marie Sangosse, M.D. 1:10-1:24).). Lenox Hill claims that it did not consider Ms. Dodd-White a candidate for a directed donation because her medical condition was "urgent."[4] (Zucker Aff. ¶ 5.) Ms. Dodd-White disagrees, claiming that she was denied information about the

---

[3] A directed transfusion is a process in which the patient pre-selects potential donors before receiving a blood transfusion. (Mitchell Aff., Ex. B, at 40); see also Directed Blood Donations, Am. Red Cross, at www.bloodct.org/directed.htm; How to Give Blood: Knowing Your Options, America's Blood Centers, at www.americasblood.org; Donating Blood for Friends and Family: Directed Blood Donation, Lifeblood, at www.lifeblood.org/donating/directed.htm. The donor must have the same blood type as the recipient and pass the same screening tests as any other donor. See id. As Plaintiff's experts concede (see Zucker Aff., Exs. G & H), the medical community does not consider blood from directed donors to be safer than blood from volunteer anonymous donors, and even warns that direct transfusions can be less safe if the blood received is from a close relative. See supra (websites cited).

[4] Dr. Randy Levine, the Director of the Blood Bank and Transfusion Center at Lenox Hill Hospital, explained in her deposition that "[t]he requests for directed donations are generated from the admitting physician to the hospital. The hospital does not generate the request for directed donations. So [the hospital] has no policy about directing anyone about directed donations. It simply has them available for those who want them." (Mitchell Aff., Ex. B., at 112.)

According to this testimony, the proper course of action would have been for Dr. Valentine, the admitting physician, to recommend a directed donation for his patient, Ms. Dodd-White, at the time she was admitted. (See id.) The hospital would then have arranged the directed donation, per the admitting physician's orders. (Id.) Once Plaintiff appeared in the Lenox Hill emergency room, however, at the direction of her treating physician, specifically for the purpose of receiving a blood transfusion and without a doctor's note ordering a directed transfusion, it is likely that the hospital classified Ms. Dodd-White's as "urgent" and never considered her an eligible candidate for a directed donation.

To the extent that denying Plaintiff the option of a directed transfusion was error, the error appears to be on the part of Dr. Valentine, the admitting physician, who knew of Ms. Dodd-White's ongoing anemia problem and upcoming fibroid removal surgery, yet never discussed the option of a directed transfusion with her or directed the hospital, upon admission, to make the option of a directed transfusion available. Nevertheless, for purposes of this motion, the Court accepts Plaintiff's assertion that Lenox Hill had an independent duty to advise the Plaintiff of her blood transfusion options.

3

risks associated with a blood transfusion or about alternative treatments, particularly a directed transfusion, because of her race.[5] (Am. Compl. ¶ 8.)

On January 9, 2001, Dr. Randy Levine, Director of the Blood Bank and Transfusion Center at Lenox Hill, sent Ms. Dodd-White a letter informing her that the donor of one of the units of blood used in her transfusion had subsequently tested positive for Hepatitis B surface antigens.[6] (Id. ¶¶ 29-30.) The letter prompted Ms. Dodd-White to have herself tested. (Id. ¶ 31.) Ms. Dodd-White tested positive for Hepatitis B on January 16, 2001. (Id.; Def.'s Local Rule 56.1 Statement ¶ 6.)

DISCUSSION

A. Summary Judgment Standard

Summary judgment shall be granted only where "there is no genuine issue of material fact," so the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Adickes v. S.H.

---

[5] Even though both sides concede that there is no medically significant difference between community blood and directly donated blood, the Court will assume for purposes of this motion that the benefit denied to Ms. Dodd-White was the right to choose.

[6] Hepatitis B is a risk inherent in any blood transfusion. See Medical Encyclopedia: Hepatitis B, Medline Plus, at http://www.nlm.nih.gov/medlineplus/ency/article/000279.htm (a service offered by the National Library of Medicine and National Institute of Health). Due to the incubation period of the Hepatitis B virus, there is a risk that tainted units of blood escape detection through recognized screening procedures and make their way to donated blood, whether directed donations or the community donation pool. See id.; supra note 3 (websites cited). Plaintiff's experts do not dispute that this risk occurs, and that the same risk exists for community pool and directly donated blood. (See Zucker Aff., Exs. G & H.)

In Ms. Dodd-White's case, the donor tested negative for Hepatitis B before giving the blood donation that resulted in the unit of blood given to Ms. Dodd-White. (Am. Compl. ¶ 30.) When the donor returned to the Blood Donor Center and attempted to donate again, however, the donor tested positive for Hepatitis B surface antigen. (Id.) This alerted the New York Blood Center that blood previously donated by the same donor could be tainted, resulting in infection to individuals who received the tainted blood.

Kress & Co., 398 U.S. 144, 157 (1970)). If the moving party establishes the absence of a genuine issue of material fact, "a limited burden of production shifts to the nonmovant, who must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" Id. (quoting Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)). If the nonmoving party fails to establish a genuine issue of material fact, summary judgment must be granted. Id.

In determining whether a genuine issue of material fact exists, the Court must examine all evidence in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (2002); Make the Road by Walking, Inc. v. Turner, 378 F.3d 133, 142 (2d Cir. 2004); Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). While summary judgment on an issue of fact is not appropriate "if there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party," Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 254 (2d Cir. 2002), a party cannot create a disputed issue of fact by offering "conclusory allegations, conjecture, and speculation." Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (quoting Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998)). As the Court made clear in its October 14, 2004 Order in this case:

> [T]he Court must . . . grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative, or not significantly probative. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) .
> . . . An "opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions." Contemporary Mission v. U.S. Postal Serv., 648 F.2d 97, 107 n.14 (2d Cir. 1981) (internal citations and quotation marks omitted).

Dodd-White v. Lenox Hill Hosp., No. 02 Civ. 5749, 2004 WL 2337016 (S.D.N.Y. Oct. 18, 2004) (granting summary judgment for defendant New York Blood Center).

B. Lenox Hill is Entitled to Summary Judgment on Plaintiff's Federal Civil Rights Claims

Plaintiff brings this case in federal court pursuant to 42 U.S.C. § 1981, the federal civil rights statute prohibiting discrimination by private individuals on the basis of race. Plaintiff alleges that Lenox Hill discriminated against her in two respects: (1) By placing her on a segregated floor of the hospital containing only minority patients, doctors, nurses and staff; and (2) By denying her the option of a directed transfusion on the basis of her race. Plaintiff fails to present any concrete, admissible evidence to support either of these allegations. Accordingly, the Court grants summary judgment for Lenox Hill on both of these claims.

*1. Plaintiff provides no concrete evidence that Lenox Hill put African-American patients on a separate floor or unit of the hospital*

In her amended complaint, Plaintiff alleges that she was transferred to a segregated, all-minority floor of the hospital. (Am. Compl. ¶¶ 22-24.) Specifically, Plaintiff alleges that the patient occupying the other bed in her room was an African-American woman, all the other patients on her section of the floor were African American, and only minority staff provided the hands-on care of patients on the floor, including nursing, transportation, and food service. Id. Other than her own "say so," however, Plaintiff offers no proof. Plaintiff's entire testimony on this issue is that she looked into no more than five rooms on a single floor of the hospital during her stay and saw in the three occupied rooms[7] "minority people, blacks, and . . . one Hispanic person." (Mitchell Aff., Ex. D, at 225-27 (Dep. of Laura Dodd-White).) According to Plaintiff, the only rational inference from this line of conjecture is that Lenox Hill is segregated. While Plaintiff's husband, Henry White, supports Plaintiff's allegations, he admits in his deposition that he did not visit his wife upstairs in her hospital room; his supporting testimony that there were no white people in the Lenox Hill emergency room on

---

[7] The other two rooms were empty. (Mitchell Aff., Ex. D, at 225-27.)

6

September 12, 2000 and that black people are sent to the "basement" emergency room at Mount Sinai Hospital is of no relevance.[8] (Mitchell Aff., Ex. G, at 85-88, 92, 99-100 (Dep. of Henry White).)

Plaintiff does not submit hospital admission records, deposition testimony, or affidavits of any other Lenox Hill patients or staff to corroborate her allegations.[9] Lenox Hill produced the head nurse on duty at the hospital for examination, yet Plaintiff failed to ask her any questions regarding the racial makeup of the floor she supervised. (Def.'s Reply 2.) Further, Lenox Hill states that it offered to produce the Lenox Hill staff member in charge of room assignments, specifically to address Plaintiff's allegations of segregation, yet Plaintiff's attorney declined the deposition.[10] (Id.)

Plaintiff's testimonial evidence does not establish a genuine issue of fact as to segregation. To survive Lenox Hill's motion for summary judgment, Plaintiff must offer concrete evidence to establish discrimination. Plaintiff's and her husband's testimony are nothing more than self-serving speculation and conjecture; they establish nothing that is relevant. Without additional

---

[8] Mr. White testified "I have been to Mount Sinai too. You go down to the emergency room, unless they have two emergency rooms . . . . [T]hey sent me down in the basement. If you go down in the basement, you don't see no white people down there." (Mitchell Aff., Ex. C, at 86-87.)

[9] The one Lenox Hill employee who was deposed on this subject, Maureen McGovern of Lenox's Hill's risk management department, testified that room assignments are not made on the basis of race, but on "patient diagnosis, their sex and who their physician was." (Def.'s Reply Aff., Ex. B, at 86.) Ms. McGovern admits that she has no personal knowledge of how room assignments are made, though she states that she has been on the floor to which Plaintiff was assigned and has seen patients of all races on that floor. (Id. at 83-89.) Her explanation of room assignments was based primarily on her interview of another employee, Barbara Wood, the bed control coordinator. Because Ms. McGovern's testimony about her interview with Ms. Woods is hearsay, the Court will not consider Ms. McGovern's statements as part of Lenox Hill's motion for summary judgment. See Fed. R. Civ. P. 56(e)(stating that all evidence submitted as part of a motion for summary judgment "shall be made on personal knowledge" and "shall set forth such facts as would be admissible into evidence").

[10] Mr. Mitchell failed to address these statements either in his opposition papers or oral argument, leading the Court to believe that Mr. Mitchell admits the truth of these statements.

evidence to corroborate these allegations, Plaintiff's § 1981 claim for racial segregation must be dismissed, as no reasonable jury could find purposeful discrimination solely from the testimony submitted. See Gen. Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 390 (1982) (holding that § 1981 claim requires proof of purposeful discrimination); see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-66 (1977) (finding that discrimination claim requires proof of both disparate impact and discriminatory purpose or intent); Washington v. Davis, 426 U.S. 229, 242 (1976) (same).

*2. Plaintiff provides no admissible evidence that Lenox Hill failed to offer African-American patients directed transfusions on account of their race*

Plaintiff also asserts that Lenox Hill violated § 1981 because it failed to offer Plaintiff the option of a directed transfusion on account of her race. We need not debate whether Lenox Hill deviated from standard hospital practice by not informing Plaintiff of the option of a directed transfusion. For purposes of this motion, the Court will assume that Lenox Hill failed to follow its internal hospital procedures, as Plaintiff's hospital chart does not contain a notation that Plaintiff was informed of the risks of a blood transfusion, and will further assume that this departure from normal procedure denied Plaintiff a benefit.[11]

At oral argument, Plaintiff's attorney conceded that the failure to warn or to give complete disclosure concerning the risks of blood transfusions and the available alternatives is not by

---

[11] Specifically, Nurse Elaine Murphy-Moise, R.N., a Lenox Hill employee, testified that it is standard hospital procedure to make a notation in a patient's chart that the doctor explained to the patient the risks of, and alternatives to, a transfusion. (Mitchell Aff., Ex. E, at 39-41.) At the deposition, Plaintiff's attorney handed Ms. Murphy-Moise a copy of Plaintiff's chart, which does not contain such an entry. Id. Ms. Murphy-Moise then testified that "the [hospital's] policy was not fully followed," because "[t]he patient signed the consent but further documentation was not placed based on the patient's understanding [of the consent form]." Id.

In addition, Plaintiff cites to the report of Dr. Marie C. Sangosse, M.D., a medical expert hired by Plaintiff, who opined in an unsworn document: "In my opinion there was a deviation from the standard practice of blood transfusion" by not entertaining the possibility of a directed transfusion in Plaintiff's case. (Id., Ex. F, at 2.)

itself discriminatory. (Tr. of Feb. 3, 2006 Oral Argument.) To prevail on a claim of race discrimination under § 1981, the hospital's failure to give the appropriate warning must be purposeful or intentional. See Gen. Bldg. Contractors Ass'n, 458 U.S. at 390. While Plaintiff proffers no direct evidence of intent, Plaintiff submits that a jury may infer the element of intent from other contemporaneous conduct: (1) the segregated floors (an allegation the Court has already found to be factually unsupported, see supra); (2) the fact that the appropriate entry was not made on her medical chart, see supra n.11; and (3) a statistical report that from January 1995 through December 2000 whites received directed transfusions at twice the rate of African-Americans–a disparate impact so great that a jury could conclude that the hospital's failure to offer a directed transfusion in Plaintiff's case was both intentional and motivated by race.

(I) *Notations in Hospital Records*

Plaintiff attempts to establish discrimination by offering evidence that Lenox Hill deviated from standard procedure–both internal hospital procedure and the standards of the general medical community–by not informing Plaintiff of the risks of a blood transfusion and the available alternatives, particularly the option of a directed transfusion. See supra n.11.

Plaintiff urges the Court to find that this deviation is concrete, admissible evidence of discrimination. As support for this proposition, Plaintiff latches onto to the Supreme Court's statement in Village of Arlington Heights that "departures from the normal procedural sequences . . . might afford evidence that improper purposes are playing a role." 429 U.S. at 267; accord Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032, 1038 (2d Cir. 1979). But the Arlington Heights Court made this statement in the context of a broader discussion about the types of indirect evidence that civil rights plaintiffs may use to establish discrimination. See id. at 266-68. Certainly, the Court did not suggest that evidence of a single, isolated incident in which one of defendant's employees failed to

follow the normal procedural sequence–the only evidence Plaintiff provides to support her case–is sufficient, by itself, to establish a prima facie case of racial discrimination. While such evidence may support a claim for medical malpractice or lack of informed consent, it does not establish a genuine issue of fact as to the existence of purposeful discrimination against African-American patients at Lenox Hill.

(ii) *Statistician's Report Concerning Directed Transfusions*

Plaintiff also submits the report and deposition testimony of Dr. Robert Grimson, Ph.D., a biostatistical expert. Dr. Grimson reviewed the records of 17,543 first-time transfusion patients at Lenox Hill Hospital over a six-year period and compared the distributions of transfusion types received by members of different racial groups. (Mitchell Aff., Ex. G, at 2-3.) Dr. Grimson's study ("the Grimson Report") concludes that "[w]hites receive directed transfusions at around twice the rate of blacks."[12] (Id. at 5.)

Plaintiff urges the Court to find that the Grimson Report creates a disputed issue of fact as to discrimination. The Court disagrees. Federal Rule 56(e) expressly provides that the federal rules of evidence govern all evidence submitted in connection with a motion for summary judgment. Fed. R. Civ. P. 56(e) (stating that "[s]upporting and opposing affidavits . . . shall set forth such facts as would be admissible in evidence"). Thus, the Court may consider only relevant evidence–i.e.,

---

[12] Dr. Grimson's ratios vary at different points in his study, so the actual ratio may, in fact, be less than 2:1. Table 1 of the study reports that 1.4% of white patients received directed transfusions, versus 0.9% of African-American patients, which is not a 2:1 ration. (Mitchell Aff., Ex. G, Table 1, at 6.) In Table 2, however, the percentages suddenly change (1.9% of white patients versus 1.0% of African-American patients), even though both tables look at the same set of patients. (Mitchell Aff., Ex. G, Table 2, at 7.) Dr. Grimson provides no explanation for this discrepancy in his report. Even if the Court accepts Dr. Grimson's 2:1 ratio, however, it would not demonstrate that the Plaintiff was discriminated against on the evening of September 12–early morning of September 13, 2000–when she was not given all appropriate information concerning blood transfusions.

10

evidence tending to make the existence of the fact of racial discrimination more or less probable. See Fed. R. Evid. 401.

The Grimson Report suffers a fatal flaw: it examines the wrong data set. Plaintiff alleges that she was discriminated against in violation of § 1981 by being "denied information about the risks associated with a blood transfusion and also denied information about alternative treatments available to her because of her race." (Am. Compl. ¶ 8; Zucker Aff., Ex. C.) Thus, the appropriate question to ask, the one relevant to Plaintiff's complaint, is whether whites were *offered* counseling and information about transfusions, while African Americans were not. Instead of examining that question, however, Dr. Grimson examined and concluded that, during the representative period at Lenox Hill, whites were almost two times as likely to *receive* directed transfusions as African Americans.

While those who received directed transfusions are obviously a subset of those who were offered transfusions, the study does not explain how a jury could extrapolate from this smaller subset to determine how, or whether, Grimson's conclusion applies to Plaintiff's case. For a number of completely race-neutral reasons–e.g., the five day processing delay, the availability of a suitable donor, the additional costs associated with the procedure, and the lack of any substantial risk differential between community blood and directly donated blood–not all individuals who are *offered* directed transfusions exercise the option and *receive* a directed transfusion.[13] The Grimson Report completely ignores this reality. As a result, even if the statistical methods utilized in the study were

---

[13] Most blood banks charge an additional surcharge for processing directed donations, which is billed to the patient. See supra note 3 (websites cited). In addition, directed donors must go through the same screening process as anonymous donors before a blood bank will permit the blood to be transfused to a patient, and the medical community does not advise that transfused blood come from a close relative (e.g., parent or sibling), as there appear to be additional risks. See id. Given these factors, many individuals who are offered directed transfusions never actually receive directed transfusions.

sound, the statistics generated by the study would not help a reasonable jury decided whether Lenox Hill failed to *offer* African-American patients directed transfusions as frequently as white patients.

Plaintiff argues that, even though the Grimson Report shows a disparity in *receipt* of directed transfusions among African-American and white patients at Lenox Hill, a jury ought to be allowed to infer from this data that the disparity was caused by discrimination in the *offering* of directed transfusions. (Tr. of Feb. 3, 2006 Oral Argument.) The Court is unwilling to make this statistical leap, however, given the many relevant factors completely unaccounted for in Dr. Grimson's study. Accordingly, the Court finds that the Grimson Report is not relevant to this case, and therefore the evidence must be excluded pursuant to Federal Rule of Evidence 401.

The Grimson Report has other, though potentially less fatal, flaws. First, the Grimson study sorted data solely on the basis of race, sex and age. It did not adjust for income or sort the data based on the reason for the transfusion or its urgency. (See Mitchell Aff., Ex. J, at 110 (Dep. of Dr. Robert Grimson, Ph.D.); Tr. of February 3, 2006 Oral Argument, Def.'s Rebuttal.) The problem with such a broad study is that not all transfusion candidates are eligible for a directed transfusion, yet the Grimson Report and its conclusions do not account for this. Thus, African-American patients who did not receive directed transfusions solely because of the nature of their conditions, would be treated as "discriminated against" for purposes of the Grimson study. Second, the Grimson Report looks only at first-time transfusion recipients. This leads to the paradoxical result that patients who did not receive directed donations the first time they received transfusions at Lenox Hill would automatically be categorized in the Grimson study as "discriminated against," even if these patients later received directed transfusions at Lenox Hill at a later date. Given these flaws, even if the Grimson Report were relevant (which the Court does not believe it is), its limited probative value is far outweighed by the risk of confusion and prejudice and its potential for misleading the jury. See Fed. R. Evid. 403.

C. The Court Declines to Exercise Supplemental Jurisdiction over Plaintiff's State Law Claims

Because the Lenox Hill's motion for summary judgment on the § 1981 claim is granted, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction."). Thus, the Court need not determine at this time whether those claims withstand summary judgment. Accordingly, the state law claims are dismissed, without prejudice to renewal in the proper state court.

CONCLUSION

Based on the foregoing, Defendant Lenox Hill Hospital's motion for summary judgment is granted as to Plaintiff's federal § 1981 claims, and these claims are dismissed with prejudice. Plaintiff's amended complaint is dismissed without prejudice as to Plaintiff's state law claims for medical malpractice, negligence, and lack of informed consent. The Clerk of the Court is directed to enter judgment and close out this case.

Dated: New York, New York
February 9, 2006

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge

Copies Mailed To:

Stephen T. Mitchell, Esq.
The Law Firm of Stephen T. Mitchell
225 Broadway
New York, New York  10007

Carol E. Russell, Esq.
Aaronson, Rappaport, Feinstein & Deutsch, LLP
757 Third Avenue
New York, New York  10017

were relevant (which the Court does not believe it is), its limited probative value is far outweighed by the risk of confusion and prejudice and its potential for misleading the jury. See Fed. R. Evid. 403.

C. The Court Declines to Exercise Supplemental Jurisdiction over Plaintiff's State Law Claims

Because the Lenox Hill's motion for summary judgment on the § 1981 claim is granted, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction."). Thus, the Court need not determine at this time whether those claims withstand summary judgment. Accordingly, the state law claims are dismissed, without prejudice to renewal in the proper state court.

## CONCLUSION

Based on the foregoing, Defendant Lenox Hill Hospital's motion for summary judgment is granted as to Plaintiff's federal § 1981 claims, and these claims are dismissed with prejudice. Plaintiff's amended complaint is dismissed without prejudice as to Plaintiff's state law claims for medical malpractice, negligence, and lack of informed consent. The Clerk of the Court is directed to enter judgment and close out this case.

Dated: New York, New York
      February 9, 2006

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge